UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTINA HENRICKS, individually and on behalf of all others similarly situated,

                Plaintiff,

                v.

FLYWHEEL SPORTS, INC., and DOES 1 through 10, inclusive, and each of them,

                Defendants.

**ORDER**

19 Civ. 895 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

        On January 29, 2019, Plaintiff Christina Henricks commenced this putative class action alleging that Defendant Flywheel Sports, Inc. ("Flywheel") violated the Telephone Consumer Protection Act by sending unwanted text messages to her cellular phone. (Dkt. No. 1) On May 30, 2019 (Dkt. Nos. 21, 22), Flywheel moved to compel arbitration and to stay this action pending arbitration. For the reasons stated below, Flywheel's motion will be granted.

## BACKGROUND

### I. FACTS

        Flywheel offers indoor cycling workout classes at studios in more than a dozen geographic areas. (Williams Decl. (Dkt. No. 21-2) ¶ 2) To sign up for a Flywheel class, a customer must have a Flywheel user account. (Justiniano Decl. (Dkt. No. 22-1) ¶ 7) Henricks' account was created on Flywheel's website on December 2, 2014 at 6:19 p.m. (Id. ¶ 5) Flywheel's account registration webpage can be accessed either remotely (for example, at home) or by using a tablet at a Flywheel studio. (Williams Decl. (Dkt. No. 21-2) ¶ 3) Either way, the sign-up process is the same. (Id.)

As of December 2014, the registration webpage appeared as follows:



(Williams Decl. Ex. B (Dkt. No. 21-4))  As shown above, the user is prompted to create a username and password and to enter other personal information (email address, first name, last name, phone number, birthday, gender, shoe size, t-shirt size, employment information, and emergency contact information).  (Id.)

Before an account is created, the user is required to click a box stating, "I agree with the Flywheel Sports **Terms and Conditions of Service** and **Privacy Policy**."  (Id.) (emphasis in original).  The text associated with "Terms and Conditions of Service" is hyperlinked in blue lettering and, when clicked, directs the user to the Terms and Conditions. (Williams Decl. (Dkt. No. 21-2) ¶ 6)  Flywheel's "Privacy Policy" is similarly hyperlinked.  (Id.) Shown below is an image of how this portion of Flywheel's website appeared:



(Def. Br. (Dkt. No. 21-1) at 6)[1]

As of December 2014, Flywheel's Terms and Conditions read as follows:

FLYWHEEL SPORTS TERMS AND CONDITIONS OF SERVICE

EFFECTIVE JANUARY 24, 2012

PLEASE READ THESE TERMS OF USE CAREFULLY, AS THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS, REMEDIES AND OBLIGATIONS.

THESE INCLUDE VARIOUS LIMITATIONS AND EXCLUSIONS, AND A DISPUTE RESOLUTION CLAUSE THAT GOVERNS HOW DISPUTES WILL BE RESOLVED.

---

[1]  All citations to page numbers refer to the pagination generated by this District's Electronic Case Files ("ECF") system.

. . .

GOVERNING LAW; VENUE AND JURISDICTION

You agree that: (i) the Flywheel website shall be deemed solely based in New York; and (ii) the Flywheel website shall be deemed a passive website that does not give rise to personal jurisdiction over Flywheel, either specific or general, in jurisdictions other than New York. These Terms of Service shall be governed by the internal substantive laws of the State of New York, without respect to its conflict of laws principles. Any claim or dispute between you and Flywheel that arises in whole or in part from the Flywheel website shall be decided exclusively by a court of competent jurisdiction located in New York, New York, and you hereby consent to, and waive all defenses of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in the state and federal courts of New York.

. . . .

ARBITRATION

YOU AND FLYWHEEL AGREE THAT, EXCEPT AS MAY OTHERWISE BE PROVIDED IN REGARD TO SPECIFIC SERVICES ON THE SITE IN ANY SPECIFIC TERMS APPLICABLE TO THOSE SERVICES, THE SOLE AND EXCLUSIVE FORUM AND REMEDY FOR ANY AND ALL DISPUTES AND CLAIMS RELATING IN ANY WAY TO OR ARISING OUT OF THESE TERMS OF USE, THE SITE AND/OR THE SERVICE (INCLUDING YOUR VISIT TO OR USE OF THE SITE AND/OR THE SERVICE) SHALL BE FINAL AND BINDING ARBITRATION. . . .

Either Flywheel or you may demand that any dispute between Flywheel and you about or involving the Flywheel Services must be settled by arbitration utilizing the dispute resolution procedures of the American Arbitration Association (AAA) in New York, New York, USA, provided that the foregoing shall not prevent Flywheel from seeking injunctive relief in a court of competent jurisdiction.

To the fullest extent permitted by applicable law, NO ARBITRATION OR CLAIM UNDER THESE TERMS OF USE SHALL BE JOINED TO ANY OTHER ARBITRATION OR CLAIM, INCLUDING ANY ARBITRATION OR CLAIM INVOLVING ANY OTHER CURRENT OR FORMER USER OF THE SERVICE, AND NO CLASS ARBITRATION PROCEEDINGS SHALL BE PERMITTED.

(Williams Decl., Ex. D (Dkt. No. 21-6))

Henricks has registered for 55 Flywheel classes (Justiniano Decl. (Dkt. No. 22-1) ¶ 8), but has never been a "direct customer" of Flywheel. (Pltf. Decl. (Dkt. No. 23-1) ¶ 5) Instead, she has always booked her Flywheel classes through ClassPass, a third-party entity.[2] (Id.) ClassPass users, however, are still required to create a Flywheel account in order to take Flywheel classes. (Williams Decl. (Dkt. No. 21-2) ¶ 8; Justiniano Decl. (Dkt. No. 22-1) ¶¶ 6-7)

In about November 2018, Henricks began to receive unsolicited spam advertisements and promotional offers from Flywheel on her cellular phone. (Cmplt. (Dkt. No. 6) ¶ 8) Henricks alleges that Flywheel sent these text messages from its "SMS blasting platform." (Id. ¶¶ 9-10) Henricks asserts that she never gave her phone number to Flywheel and never consented to receive text messages from the company. (Id. ¶ 14) Documentary evidence provided by Defendant shows that Flywheel obtained Henricks' phone number (and other personal information about her) when her account was created in December 2014. (Williams Decl. (Dkt. No. 21-2) ¶ 7, Ex. C (Dkt. No. 21-5))

Henricks claims that Flywheel's transmission of text messages to her violated the Telephone Consumer Protection Act. (Cmplt. (Dkt. No. 6) ¶¶ 28-37)

## II.  PROCEDURAL HISTORY

The Complaint was filed on January 29, 2019, on behalf of Henricks and "all persons within the United States who received any unsolicited text messages from [Flywheel]

---

[2] According to its website, "ClassPass is a monthly subscription service providing access to the world's largest network of boutique fitness studios and gyms." Press Room, CLASSPASS, https://classpass.com/press-room/ (last visited Mar. 18, 2020); see also Fantis v. Flywheel Sports, Inc., No. 18-24934-CIV, 2019 WL 1582957, at *3 (S.D. Fla. Mar. 11, 2019), report and recommendation adopted, 2019 WL 2245417 (S.D. Fla. Apr. 29, 2019), appeal dismissed, 2019 WL 5598342 (11th Cir. Oct. 22, 2019) ("ClassPass . . . membership . . . enables . . . members to reserve and schedule a wide range of fitness and recreational classes and services offered and operated by fitness studios, gyms, trainers, venues or other third parties that partner with ClassPass. . . .") (internal quotation marks omitted).

which text message was not made for emergency purposes or with the recipient's prior express consent within the four years prior to the filing of this Complaint." (Dkt. No. 1; Cmplt. (Dkt. No. 6) ¶ 17) On May 30, 2019, Flywheel moved to compel arbitration and to stay this action pending arbitration. (Def. Br. (Dkt. No. 21-1; Def. Reply (Dkt. No. 22)) Henricks opposes Flywheel's motion. (Pltf. Opp. (Dkt. No. 23))

## DISCUSSION

### I. LEGAL STANDARD

Under the Federal Arbitration Act (the "FAA"), an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such [an] agreement." 9 U.S.C.§ 4. The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Hartford Accident & Indem. Co. v. Swiss Reinsur. Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).

Motions to compel arbitration pursuant to the FAA are considered "under a standard similar to the standard for a summary judgment motion." Kutluca v. PQ N.Y. Inc., 266 F. Supp. 3d 691, 700 (S.D.N.Y. 2017) (citing Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." Bensadoun, 316 F.3d at 175 (citing 9 U.S.C. § 4). However, "[a] party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." Harrington v. Atl. Sounding Co., 602 F.3d 113, 124 (2d Cir. 2010) (citing Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91-92 (2000)).

In resolving a motion to compel arbitration, courts consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," and draw all reasonable inferences in favor of the non-moving party. Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (citation and internal quotation marks omitted). "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." Id. (citation and alteration omitted). Courts, not arbitrators, must decide whether parties have agreed to arbitrate "unless the parties clearly and unmistakably provide otherwise." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016). Finally, the FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay is requested." Katz v. Cellco P'ship, 794 F.3d 341, 343 (2d Cir. 2015).

## II.  ANALYSIS

To decide whether claims are arbitrable, courts must determine: "(1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." Begonja v. Vornado Realty Trust, 159 F. Supp. 3d 402, 408-09 (S.D.N.Y. 2016) (citing Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008)). Here, only the answer to the first question is in dispute.[3]

---

[3] As to scope, the alleged arbitration agreement covers "any and all disputes and claims relating in any way to or arising out of these terms of use, the [Flywheel web]site and/or . . . service." (Williams Decl. Ex. D (Dkt. No. 21-6) at 7)  Accordingly, if the parties in fact entered into an agreement to arbitrate, that agreement would cover Henricks' claims.  She does not argue otherwise.  As to congressional intent, "courts in this Circuit have found no congressional intent

7

State law governs the inquiry into whether parties agreed to arbitrate. See Meyer, 868 F.3d at 73-74. Here, the parties agree that New York law applies. (Def. Br. (Dkt. No. 21-1) at 8; Pltf. Opp. (Dkt. No. 23) at 11) Accordingly, the Court will apply New York law. See 120 Greenwich Dev. Assocs., L.L.C. v. Admiral Indem. Co., No. 08 CIV. 6491 (LAP), 2013 WL 12331487, at *5 n.4 (S.D.N.Y. Sept. 25, 2013) ("The parties do not dispute that New York law applies . . . . As such, New York law is applied because the Court need not undertake a choice of law analysis sua sponte where parties apply the law of one state and do not dispute application of that state's law."); Metro. Transp. Auth. v. James River Ins. Co., No. 19-CV-3266 (RA), 2019 WL 5212286, at *2 (S.D.N.Y. Oct. 16, 2019) ("The parties do not dispute that New York law governs the claims at issue in this case, and the Court therefore applies New York law. . . .").

In New York, "[i]t is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019); see also Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 29 (2d Cir. 2002) ("Mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract."). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Starke, 913 F.3d at 288. "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Id. at 289.

---

to render [Telephone Consumer Protection Act] claims non-arbitrable." Smith v. Xlibris Publ'g, 15-cv-5334 (DLI)(RER), 2016 WL 5678566, at *6 (E.D.N.Y. Sept. 30, 2016) (collecting cases). Finally, Henricks' only claim is under the Telephone Consumer Protection Act. Accordingly, there is no issue regarding the staying of other claims.

8

"Where an offeree does not have <u>actual</u> notice of certain contract terms, he is nevertheless bound by such terms if he is on <u>inquiry</u> notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." <u>Id.</u> (emphasis in original). "In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention." <u>Id.</u> "This often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." <u>Id.</u> "In the context of web-based contracts, [courts] look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in ways that would put her on inquiry notice of such terms." <u>Id.</u> Where terms are presented in a clear and conspicuous way, users are "on inquiry notice" of those terms, even if "many users will not bother reading" them. <u>Meyer</u>, 868 F.3d at 79.

Here, the "Terms and Conditions of Service" hyperlink is in distinctive blue lettering that stands out to the user. It was also necessary for users to check a box to confirm that they agreed to those terms and conditions before an account could be created. The Court concludes that Flywheel's registration page presented the company's terms and conditions in a clear and conspicuous way. Courts in this Circuit have repeatedly held that users have assented to terms of use that are accessible via a hyperlink where the user has clicked to accept the terms of use – regardless of whether the users ever read them. <u>See, e.g., id.</u> at 79-80 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."); <u>Broker Genius, Inc. v. Zalta</u>, 280 F. Supp. 3d 495, 521 (S.D.N.Y. 2017) ("[T]he Court concludes that the hyperlink to the Terms of Use was 'reasonably conspicuous' and that users are required to provide an 'unambiguous' 'manifestation of assent' by clicking on a box next to the words: 'I

agree.'"); Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015) (noting that almost every district court to consider the issue "has found 'clickwrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable.").

Here, Henricks has no complaint concerning the design of Flywheel's registration webpage, or the process by which users create an account on that page. Instead, Henricks contends that she never "participate[d] in the sign-up process" at all, noting that she "do[es] not recognize the sign-up page" or "recall ever going to that site." (Pltf. Decl. (Dkt. No. 23-1) ¶ 7) Acknowledging Henricks' assertion that she does not recall visiting the Flywheel registration webpage, courts in this Circuit have repeatedly held that "failing memories do not absolve a party from its contractual obligations." Kutluca, 266 F. Supp. 3d at 701-02 (granting motion to compel arbitration where "Plaintiff . . . states that he does not recall signing into TriNet's Passport portal, and thus he does not recall clicking 'I Accept' to the terms"); see also Plazza v. Airbnb, Inc., 289 F. Supp. 3d 537, 550 n.19 (S.D.N.Y. 2018) ("Although Plaintiffs do not recall certain facts related to seeing, being provided with, or being required to agree to Airbnb's [terms of service] during the initial registration process . . . , Plaintiffs' lack of recollection does not create a meaningful dispute of fact."); Gonder v. Dollar Tree Stores, Inc., 144 F. Supp. 3d 522, 528 (S.D.N.Y. 2015) ("A mere assertion that one does not recall signing a document does not, by itself, create an issue of fact as to whether a signature on a document is valid – especially in the absence of any evidence the document was fabricated."); Zaltz v. JDate, 952 F. Supp. 2d 439, 451-52 (E.D.N.Y. 2013) (holding that plaintiff accepted terms of service where it was "clear that in order to have obtained a JDate.com account . . . plaintiff [must have] clicked the box confirming that she had both read and agreed to the website's Terms and Conditions of Service . . . even though she does not recall the specific terms at this time"); Fteja v. Facebook, Inc., 841

F. Supp. 2d 829, 834-35 (S.D.N.Y. 2012) (holding that, "[a]s a matter of logic," plaintiff must have accepted Facebook's terms of service, even if she does not remember doing so, because putative users cannot become users without accepting the terms of service).

Henricks' assertion that she did not participate in Flywheel's sign-up process contradicts evidence demonstrating that (1) her account was created on Flywheel's website on December 2, 2014 at 6:19 p.m.; and (2) all website users must follow the same sign-up process. (Pltf. Decl. (Dkt. No. 23-1) ¶ 7; Justiniano Decl. (Dkt. No. 22-1) ¶ 3; Williams Decl. (Dkt. No. 21-2) ¶ 3, Ex. A (Dkt. No. 21-3))  In light of this evidence, Henricks' denial does not create an issue of fact.  See Katz v. Travelers Prop. Cas. Co. of Am., No. 2:16-cv-04389 (ADS)(SIL), 2019 WL 4736911, at *7 (E.D.N.Y. Sept. 26, 2019) ("Although courts are to normally avoid assessing the credibility of testimony on summary judgment motions, they need not adopt wholly self-serving testimony contradicted by the objective evidence in the case."); Anthony v. GE Capital Retail Bank, 321 F. Supp. 3d 469, 474 (S.D.N.Y. 2017) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The Court further notes that Henricks' Flywheel profile was created in December 2014, and her declaration – in which she denies participating in the registration process – is dated May 2019.  (Justiniano Decl. (Dkt. No. 22-1) ¶ 3; Pltf. Decl. (Dkt. No. 23-1))  It is entirely implausible that Henricks would have any memory of whether she visited Flywheel's registration page more than four years ago.  See Martinez v. Paramount Country Club, No. 18 CV 4668 (VB), 2019 WL 4450552, at *2 (S.D.N.Y. Sept. 17, 2019) (finding "implausible" plaintiff's

11

testimony that "at no point did he create an Oasis account or password, and that the first time he became aware of the arbitration agreement was after he filed this lawsuit").

Henricks speculates that Flywheel "desk attendants" may have "made modifications to [her] account through some form of internal company web portal," and accepted the arbitration agreement "on [her] behalf." (Pltf. Decl. (Dkt. No. 23-1) ¶ 6) But this speculation is also entirely implausible, because this theory would entail that Flywheel employees submitted Henricks' personal information through the registration webpage and, without her knowledge, created a username and password for her. (Williams Decl. (Dkt. No. 21-2) ¶ 3, Ex. B (Dkt. No. 21-4) There is no evidence that this took place, and Henricks' speculation on this point is not sufficient to create an issue of fact. See Martinez, 2019 WL 4450552, at *2 ("[P]laintiff would have the Court infer that . . . a member of [defendant's] accounts receivable and payroll department filled out and signed the Oasis forms for him, including the employee acknowledgments form with the arbitration agreement. The Court finds plaintiff's account implausible, uncorroborated by anything but plaintiff's own testimony.").

Finally, Henricks emphasizes that she "did not sign up for Flywheel courses through the Flywheel website, but instead through ClassPass." (Pltf. Decl. (Dkt. No. 23-1) ¶ 9) But even if users enrolled in Flywheel classes through ClassPass, they still had to create a Flywheel account. (Justiniano Decl. (Dkt. No. 22-1) ¶¶ 6-7 ("It was not possible in 2014 to automatically link a ClassPass account with a Flywheel account. . . . [T]o the extent that Plaintiff had a separate ClassPass account, there was no way for . . . Plaintiff to sign up for a Flywheel class using her ClassPass account without having her own Flywheel account. . . .").  In sum, Henricks' status as a ClassPass user has no bearing on whether she accepted the arbitration agreement.

\*   \*   \*   \*

The record before this Court demonstrates that Henricks created a Flywheel account in December 2014 and, in doing so, agreed to Flywheel's Terms and Conditions of Service, which include an arbitration agreement that encompasses her Telephone Consumer Protection Act claims. That Henricks does not recall creating the Flywheel account – and denies doing so – does not create an issue of fact.

## **CONCLUSION**

Flywheel's motion to compel arbitration (Dkt. No. 21) is granted. The action is stayed pending the outcome of arbitration proceedings.

Dated: New York, New York
March 18, 2020

SO ORDERED.

_Paul G. Gardephe_

Paul G. Gardephe
United States District Judge